**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JUDITH A. YOST,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 1423** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Judith Yost brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff subsequently filed a motion for summary judgment seeking reversal of the Administrative Law Judge's decision. After careful review of the parties' briefs and the record, the Court now grants Plaintiff's motion and remands the matter solely for further questioning of the vocational expert on the effect of Plaintiff's mild difficulties with concentration, persistence, or pace.

## PROCEDURAL HISTORY

Plaintiff applied for disability insurance benefits on October 2, 2006, alleging that she became disabled on December 7, 2002 due to Reflex Sympathetic Dystrophy Syndrome / Complex Regional Pain Syndrome (RSD/CRPS), degenerative disc disease, and depression. (R. 18, 20). The Social Security Administration denied the application

initially on December 15, 2006, and again upon reconsideration on March 27, 2007. (R. 18). Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Peter J. Caras held a hearing on May 20, 2009, where he heard testimony from Plaintiff, represented by counsel, and a vocational expert. (R. 29-66). On August 18, 2009, the ALJ found that Plaintiff is not disabled because she is capable of performing a significant number of jobs available in the national economy. (R. 26-28). The Appeals Council denied Plaintiff's request for review on November 17, 2010. (R. 7-9).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. Plaintiff advances three grounds for reversal. She first challenges the RFC determination on the grounds that the ALJ selectively and erroneously considered her treating physician's opinion and failed to consider the severity and symptoms of her RSD/CRPS. Plaintiff next argues that the ALJ's credibility finding failed to consider her treatment history and efforts to alleviate her pain or her attempts to return to work, and that the ALJ improperly relied on Plaintiff's ability to perform certain daily activities. Finally, she argues that the ALJ's conclusion that she can work is deficient because the ALJ failed to adequately question the vocational expert.

## FACTUAL BACKGROUND

Plaintiff was born on February 28, 1969, and was 39 years old as of her date last insured ("DLI") of March 31, 2008. (R. 20, 26). She completed high school and two years of college, and is able to communicate in English. (R. 26, 59). Her past relevant work experience includes jobs as a bartender and a real estate title abstractor. (R. 26, 147).

2

A.    **Plaintiff's Medical History**

1.    **Foot Pain**

The record in this matter shows that Plaintiff was injured and allegedly became disabled on December 7, 2002 when several large baking pans fell on her left foot while she was working as a bartender and server at a restaurant and bar.  (R. 228, 264, 369).  The emergency room doctor at Silver Cross Hospital observed that her foot was "significantly swollen" but showed "no significant deformity."  (R. 263-64).  An x-ray of her foot was negative and no fracture was noted, although her foot was placed in a hard cast.  (R. 227, 264, 369).  After Plaintiff complained of severe pain and swelling, the cast was removed a week later and her foot was instead placed in a "bulky wrap with cast padding and an ace bandage."  (R. 266-67).

Upon examination two days later, Dr. Giridhar Burra of Parkview Musculoskeletal concluded that the "soft tissues are intact" and there is "no evidence of compartment syndrome."  (R. 227).  Another x-ray of her foot from multiple views revealed no fracture.  (*Id.*).  Dr. Burra placed her foot in a Cam walker, or walking boot, and referred her to Dr. Brian Couri at Silver Cross Hospital for consultation concerning her rehabilitation.  (R. 227, 244-246).  Dr. Burra and Dr. Couri both noted that a subsequent x-ray revealed a hairline fracture over the fifth metatarsal.[1]  (R. 224, 244).  On February 13, 2003, Dr. Couri diagnosed Plaintiff with complex regional pain syndrome of the left foot.[2]  (R. 245).  Dr.

---

[1]    The record does not appear to contain any conclusive evidence of a hairline fracture, although a bone scan in January 2003 indicated a "possible occult fracture at the head of the fifth metatarsal."  (R. 269).

[2]    Complex Regional Pain Syndrome "is a chronic pain condition that can affect any area of the body, but often affects an arm or a leg."    PubMed Health,

Couri recommended a treatment plan of sympathetic nerve block injections and occupational therapy for "desensitization" and "aggressive range of motion" of her left foot, as well as Neurontin for the pain and Trazodone for her sleep dysfunction. (*Id.*). Plaintiff also completed 26 physical therapy sessions from December 30, 2002 through April 16, 2003. (R. 327).

In 2003, Plaintiff had several follow-up visits with Parkview physician's assistant Mark Bordick and received treatment from Dr. Boris Nulman at Silver Cross Hospital's Pain Clinic. Mr. Bordick's treatment notes from February 2003 state that Plaintiff reported "mild discomfort," no numbness or tingling, and "decreasing symptoms in regards to what was diagnosed as reflex sympathetic dystrophy[3] in the past, i.e. hypersensitivity, etc." (R. 224). He advised Plaintiff to "continue to work her current light duty status" of four hour workdays. (*Id.*). In April, he noted that Plaintiff "states she received some relief from the [nerve block] injections, however continues to have mild discomfort." (R. 224).

Between March 21 and May 1, 2003, Plaintiff received four lumbar sympathetic blocks from Dr. Nulman, who observed upon initial examination that "[s]he does appear to have [the] first stage of RSD." (R. 270-77). He noted on May 1, 2003 that "pain free

---

http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004456/ (last viewed July 9, 2012). "Doctors aren't sure what causes the condition, " although it "is thought to result from damage to the nervous system, including the nerves that control the blood vessels and sweat glands," rendering the damaged nerves "no longer able to properly control blood flow, feeling (sensation), and temperature to the affected area." *Id.*

[3]     Reflex Sympathetic Dystrophy Syndrome is a term used interchangeably with Complex Regional Pain Syndrome. *See* PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004456/ (last viewed July 9, 2012).

periods are getting longer" and Plaintiff has "a decreased degree of allodynia[4] and hyperpathia[5] even when pain comes back." (R. 277). Plaintiff saw Dr. Couri again in May 2003, at which time he noted that she "feels better" after the lumbar sympathetic blocks, with the first block helping the most and subsequent blocks lasting only 7-10 days. (R. 240). He also noted that she has difficulty with the cold and has increased pain when water hits her foot or when she inverts it. (*Id.*). He advised her to discontinue physical therapy and continue her home exercise program. (*Id.*). Due to the "diminishing return" of the blocks, Dr. Couri, in consultation with Dr. Nulman, recommended radiofrequency treatment "for more permanent relief." (*Id.*). Dr. Nulman subsequently performed a radiofrequency lesioning[6] of the left lumbar sympathetic chain in June 2003. (R. 278-79).

The record indicates that Plaintiff's pain returned in the fall of 2003. In October of that year, Mr. Burdick noted that "her condition has been virtually asymptomatic" but that she recently began experiencing "increasing discomfort" in the form of an "achy" pain due to "weather changes," with the pain worsening "with ambulation as well as cool temperatures." (R. 223). Due to the "infrequent nature of discomfort," she was prescribed the anti-inflammatory Vioxx. (*Id.*).

---

[4]    Allodynia is "pain resulting from a stimulus (as a light touch of the skin) which would not normally provoke pain." Merriam-Webster Dictionary, http://www.merriam-webster.com/medical/allodynia (last viewed July 9, 2012).

[5]    Hyperpathia is a "disagreeable or painful sensation in response to a normally innocuous stimulus (as touch)." Merriam-Webster Dictionary, http://www.merriam-webster.com/medical/hyperpathia (last viewed July 9, 2012).

[6]    Radiofrequency lesioning or ablation is a procedure for treating chronic pain "in which a portion of nerve tissue is heated to cause an interruption in pain signals and reduce pain in that area." WebMD, http://www.webmd.com/cancer/tc/radiofrequency-lesioning-for-chronic-pain- (last viewed July 9, 2012).

After eight months without a visit, Plaintiff returned to Dr. Couri in January 2004, complaining that her foot pain had returned the previous September. (R. 238-39). Dr. Couri noted that the treatment with Dr. Nulman "helped to diminish a significant amount of symptoms, although she never got rid of the dysesthetic pain on the top of her foot." (R. 238). Plaintiff complained of "a new pain that is pulsating on the top of her foot" at the initial injury sight. (*Id.*). He concluded that "she may have sustained some nerve damage to her left foot," and assessed her condition as Type II complex regional pain syndrome. (R. 238-39). He noted that she "had responded well to the sympathetic ganglion denervation with it working for about 4-6 months," but recommended repeating the radiofrequency procedure. (*Id.*). He further recommended that she remain on her current medications and not work "anymore than 6-8 hours on her feet at one time." (R. 239). Dr. Nulman subsequently performed a radiofrequency ablation of the left lumbar sympathetic chain in February 2004. (R. 281-82).

Plaintiff did not see Dr. Couri again for more than a year. (R. 236). When she saw him next in February 2005, she complained of foot pain that was different from the pain associated with her complex regional pain syndrome. (*Id.*). She told Dr. Couri that she saw a podiatrist six to seven months prior who had diagnosed her with a neuroma[7] and told her to wear certain shoes, which "has helped very slightly," but she stated the podiatrist "was reluctant to recommend any surgery due to her diagnosis of complex regional pain syndrome." (*Id.*). Dr. Couri recommended additional radiofrequency treatment, a sinus tarsi injection, further podiatric consultation to improve her ankle and foot mechanics, and

---

[7] A neuroma is "a tumor or mass growing from a nerve." Merriam-Webster Dictionary, http://www.merriam-webster.com/medical/neuroma (last viewed July 9, 2012).

continuation of desensitization and range of motion therapy. (*Id.*). Plaintiff subsequently underwent another radiofrequency procedure on April 12, 2005. (R. 290-91). About two weeks later, Dr. Couri noted that she had "a good response" to the procedure and that her neuroma "has gotten better," although less than two weeks later she complained that the pain was returning. (R. 233, 234). Dr. Couri concluded that "it is difficult to tell how much further treatment [Plaintiff] will need" for her complex regional pain syndrome. (R. 234). Plaintiff was discharged from physical therapy after three sessions in May 2005. (R. 340).

Plaintiff's complaints of foot pain resumed in 2006 and she saw a podiatrist, Dr. Michael McDermott, on several occasions early in the year. (R. 252-55). A bone scan performed on March 29, 2006 revealed "[m]oderately intense, asymmetric, apparently traumatic activity at the distal left fifth metatarsal region," which "appears to have regressed" since the prior bone scan of January 2003. (R. 250-51). The bone scan report concluded that an occult fracture was unlikely but that reflex sympathetic dystrophy was "difficult to exclude." (*Id.*). Upon reviewing the scan on April 4, 2006, Dr. McDermott assessed Plaintiff with "[w]orsening Reflex Sympathetic Dystrophy [of the] left foot and ankle." (R. 248). He advised Plaintiff to continue physical therapy and activity but recommended referral to a pain clinic or physiatrist "for probable sympathectomies." (*Id.*). Plaintiff also completed 36 physical therapy sessions from January 4, 2006 through June 1, 2006. (R. 355).

On May 8, 2006, Plaintiff saw Dr. Faris Abusharif at the Joliet Pain Care Center for a new patient consultation. (R. 455-56). He administered a nerve block, which provided relief for approximately eight months, and administered another block on February 1, 2007. (R. 457-59). He advised that if her symptoms persisted or the relief from the blocks was

short-lived, he strongly encouraged her to undergo a trial for a spinal cord stimulator which can provide long-term relief. (R. 456, 458, 460). On July 18, 2007, Dr. Abusharif administered another nerve block, and several weeks later, a lumbar epidural steroid injection. (R. 603-06).

After examining Plaintiff on August 15, 2007, Dr. Abusharif wrote a lengthy summary of Plaintiff's medical history since her foot injury. (R. 607-10). He concluded that the pattern of short-term relief followed by pain flare-ups "will likely be something that will be a pattern for the rest of her life," although he also noted the possibility of implanting a spinal cord stimulation device for longer-term relief or nerve blocks and sympathetic lesioning for 4-6 months of relief at a time. (R. 609). He also noted that she will continue to require medication during flare-ups. (*Id.*). Dr. Abusharif noted that, at that time, she was taking "only" 500 milligrams of Naproxen because her pain was under control from the nerve block administered the prior month. (R. 610).

On September 13, 2007, Plaintiff had a follow-up consultation with Dr. Abusharif, during which they discussed the spinal cord stimulator option that Dr. Abusharif noted would address both her foot and back pain. (R. 611). Plaintiff declined to pursue that option, however, and instead "expressed interest in a TENS unit."[8] (*Id.*). Dr. Abusharif noted that he would have her primary care doctor obtain an order for the unit, and otherwise noted that her pain was "under adequate control." (*Id.*). The record does not indicate whether Plaintiff ever obtained or used a TENS unit. Plaintiff next returned to Dr.

---

[8]     A transcutaneous electrical nerve stimulation (TENS) unit "is a therapy that uses low-voltage electrical current for pain relief." WebMD, http://www.webmd.com/pain-management/tc/transcutaneous-electrical-nerve-stimulation-tens-topic-overview (last viewed July 9, 2012).

Abusharif approximately ten months later, in July 2008, complaining of flare-ups within the prior three weeks, and he administered a nerve block a couple weeks later. (R. 612-13).

### 2.    Back Pain

In addition to her foot pain, Plaintiff complained of a back injury she incurred from falling down some stairs on March 16, 2005. (R. 289). About a week after the fall, she saw Dr. Ananda Pillai for pain in her lower back. (R. 363). An x-ray of her lumbar spine, sacrum and coccyx was normal, and Dr. Pillai recommended she treat the pain with Naprosyn and Flexeril. (R. 289, 363). In an April 28, 2005 follow-up appointment with Dr. Couri concerning her foot, she told him of the fall and complained of new pain that Dr. Couri characterized as left S1 radiculopathy, and which he posited may be attributable to the fall. (R. 234). An MRI of her lumbar spine revealed "[m]inimal degenerative changes of the L5-S1 disc space level" but was "otherwise unremarkable." (R. 294). Dr. Couri recommended six sessions of physical therapy, a left S1 transforaminal epidural steroid injection, and Ibuprofen and Flexeril. (R. 233).

About nine months later, on January 31, 2006, Plaintiff underwent a lumbar spinal MRI after experiencing back pain for two weeks. (R. 298). The report noted a "3mm central protrusion of [the] disc at L5-S1," and observed that this was similarly indicated in the April 2005 scan, but otherwise found the MRI "unremarkable." (*Id.*). The record is devoid of further documentation of back pain for over two and a half years, until Dr. Abusharif administered a lumbar epidural steroid injection at L5-S1 on September 12, 2008 and again on November 3, 2008. (R. 614-15).

### 3.    Functional Assessment and Work Hardening Program

In February 2009, a few months before the May 2009 hearing before the ALJ, Dr. Abusharif requested a functional assessment of Plaintiff, which was performed by Alyssa Emanuelson, MS, ATC, of ATI Physical Therapy. (R. 479-86). The assessment concluded that Plaintiff could work for eight hours, including sitting or standing for eight hours for 60 minutes at a time, and that she could walk for five to six hours in total, including occasional long distances. (R. 480). The report noted that Plaintiff grimaced or complained of pain or soreness while performing certain activities, such as pushing and pulling, carrying, and repetitive foot motion. (R. 483). Plaintiff also reported low back pain after 35 minutes of sitting and 23 minutes of standing. (R. 484). Ms. Emanuelson concluded that Plaintiff is capable of light work, which included her then-employment as a bartender, and recommended a trial return to work and a four to six week course of work hardening and conditioning to maximize her functional ability. (R. 479). Dr. Abusharif approved the work hardening program (R. 487, 616).

Plaintiff began the program on March 2, 2009, and Dr. Abusharif noted that "she was progressing quite well" after one week, although due to increasing pain in her lower extremity, he advised suspending the work conditioning to administer another nerve block, after which Plaintiff could "resume [the program] within a day." (R. 618). In an April 15, 2009 follow-up with Dr. Abusharif, Plaintiff reported increasing pain, therefore Dr. Abusharif recommended another nerve block and a modified work hardening program of decreased intensity for no more than two to three hours until the pain is under control. (R. 620). On June 3, 2009, a couple weeks after the hearing before the ALJ, Plaintiff was discharged from the work hardening program, with the notation that she continues to function at a

10

light/medium physical demand level from a functional standpoint, although she continues to have difficulty with squatting and walking over unlevel surfaces. (R. 621).

Dr. Abusharif's last notes in the record indicate that Plaintiff was able to tolerate two hours of work hardening before the pain became "quite significant." (R. 622). He concluded that Plaintiff "functions at a light physical demand and can do that quite consistently as long as there [are] some breaks in between to rest when the pain starts [to] become intense." (*Id.*). He observed that "for the most part [Plaintiff] is able to function through her activities of daily living and has no significant problems day to day." (*Id.*). She typically has two to three significant flare-ups per year of her complex regional pain syndrome, which are brought under control with sympathetic nerve blocks, but otherwise "she is functioning fairly well" so long as she "does things at her own pace which is usually a two hour stretch of activity and with rest in between." (*Id.*). Her back pain symptoms "have responded very well to treatment . . . [which] typically occurs once to twice per year." (*Id.*). Dr. Abusharif recommended discontinuing work hardening since "she has reached the maximum medical improvement." (*Id.*).

### 4. Depression

The record contains a small amount of documentation that Plaintiff suffered from depression. Plaintiff was treated for "mood depressed affect" at Central Professional Group in Joliet on fourteen occasions between December 2005 and March 2007. (R. 462-67). The treatment notes indicate that she discontinued taking Wellbutrin and Lexapro in early 2006, and was prescribed Xanax. (R. 465). The documented sources of her anxiety and depression included chronic pain in her foot as well as family and other personal

issues. (R. 462-66). A second set of treatment notes indicates she returned in June 2008 after her husband was in a motorcycle accident, receiving treatment for anxiety and depression on fourteen occasions from June 2008 to March 2009. (R. 476-78).

### 5. Agency Reviewing Medical Sources

On November 28, 2006, Dr. Virgilio Pilapil completed a Physical Residual Functional Capacity Assessment for the Bureau of Disability Determination Services ("DDS"). (R. 425-32). Dr. Pilapil specified a primary diagnosis of Reflex Sympathetic Dystrophy (RSD) of the left foot and ankle and a secondary diagnosis of Complex Regional Pain Syndrome (CRPS). (R. 425). He provided an overview of Plaintiff's three-year history of pain due to the injury to her left foot, and the extensive treatment she received, including neuroma injections, special shoes, radiofrequency lesioning, and nerve root blocks. (R. 427). He concluded that Plaintiff is able to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk with normal breaks for at least 2 hours in an 8-hour workday, sit with normal breaks for at least 6 hours in an 8-hour workday, and push and/or pull with the limitation that she cannot use her left foot for machinery or foot control due to pain. (R. 426). Finally, he concluded that Plaintiff has no manipulative, visual, communicative, or environmental limitations. (R. 428-29).

On December 4, 2006, Dr. Erwin J. Baukus, PhD completed a psychological assessment of Plaintiff upon referral from the DDS, including a review of Plaintiff's medical records and an interview and mental status examination. (R. 433-37). Dr. Baukus noted Plaintiff's complaints of various "depressive symptoms" and symptoms of "generalized persistent anxiety." (R. 435). In assessing her mood and affect, Dr. Baukus noted that Plaintiff "was easily moved close to tears" and her mood "was depressed and mildly

12

anxious." (R. 436). Dr. Baukus diagnosed Plaintiff with Chronic Pain Syndrome with Depression and Anxiety, and also noted Plaintiff's "self report of RSD pain and diagnosis of RSD in the referral information" that was provided to him. (R. 437).

A week later, on December 11, 2006, Dr. Leslie Fyans, PhD completed a Psychiatric Review Technique for the DDS, which included a review of medical records and a clinical examination of Plaintiff. (R. 438-51). Dr. Fyans concluded that a "medically determinable impairment is present that does not precisely satisfy the diagnostic criteria," and identified Plaintiff's disorder as "affective reactivity due to pain," but noted that Plaintiff's mental status examination is within normal limits. (R. 441). Dr. Fyans assessed Plaintiff's degree of limitation as "mild" in terms of restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 448). Dr. Fyans made the following additional observations about Plaintiff: "mood was depressed, no thought process problems, abstract thinking adequate, and [diagnosis] was chronic pain syndrome with anxiety and depression." (R. 450). Dr. Fyans concluded that Plaintiff "[s]eems capable of SGA [substantial gainful activity]." (*Id.*).

On March 31, 2007, Dr. Phyllis Brister, PhD completed a Request for Medical Advice for the DDS upon reconsideration. (R. 468-70). She reviewed the evidence in the file and affirmed both Dr. Pilapil's RFC assessment and Dr. Fyans' psychiatric assessment as written. (R. 469).

### B. Plaintiff's Testimony

At the hearing before the ALJ on May 20, 2009, Plaintiff testified at length concerning the symptoms and limitations from which she suffers due to pain in her left foot

and ankle and in her back. (R. 35-36). The intensity of her pain fluctuates with the weather, her activity level, and the frequency of epidural nerve block injections she receives. (R. 36-41). "[S]ometimes [she] can go for hours standing up. . . [but] [s]ometimes [she] can go for none" and "it really varies on the weather." (R. 58). Plaintiff is unable to work, even in warmer weather, due to pain and "tingling" in her foot and the resulting lack of sleep. (R. 41-43). She sleeps only three to four hours per night, which causes her to "forget things." (R. 43). Sometimes a physical sensation keeps her awake, and other times "it's just the fact that I cannot go to sleep. . . I don't know why." (R. 44).

Due to depression and difficulty sleeping, Plaintiff averages two or three "bad days" per week and as many as four during cold weather. (R. 46-47). Her typical day involves waking up at six to get her two children off to school, followed by propping her foot up for twenty minutes per hour "[p]retty much all day," although she will get up to take a shower, do laundry, help her children with homework, and make dinner. (R. 47-50). She occasionally goes grocery shopping, sometimes with her husband's assistance. (R. 50-52).

Plaintiff's doctor prescribed Vicodin for her pain, but she "can't fall asleep on that" since it makes her "hyper." (R. 44, 54). She found that Darvocet "kind of helped out," but she takes it "as a last resort" since it causes her to feel "[g]roggy" the next day and she "can't function." (R. 44, 54-55). She usually takes Naproxen for her pain. (R. 54, 55). Plaintiff also received treatment for depression until December 2008, but currently takes no medication for depression. (R. 45-46, 55).

Plaintiff was participating in a "work hardening" program to physically condition her to return to work, but it causes her pain and she "just can't function afterwards." (R. 34-35,

14

56).  Her foot had become painfully swollen during the time she drove to and sat through

the hearing.  (R. 52).  She does not believe she has the concentration to work full-time due

to the pain in her foot and back.  (R. 52-53).

## C.    Vocational Expert's Testimony

George Paprocki testified at the hearing as a vocational expert ("VE").  (R. 59-64).

In response to the ALJ's inquiry, the VE first confirmed that Plaintiff is no longer able to

perform her past work, which was semi-skilled and skilled in nature.  (R. 60).  The ALJ then

described a hypothetical individual of Plaintiff's age and education level who is limited to

light and sedentary work that is unskilled and involves "one-two-step operations;" cannot

climb ladders, ropes or scaffolds; can perform minimal climbing, balancing, stooping,

kneeling, crouching, and crawling; must avoid unprotected heights and hazards, including

machinery; and must avoid concentrated exposure to extreme cold.  (R. 59-60).  For

sedentary work, the ALJ further specified that the hypothetical includes an alternating sit-

stand option every 30 minutes.  (R. 60).  The VE testified that such an individual could

perform light jobs such as small parts assembler or plumbing hardware assembler, which

are part of a category of positions for which 40,000 jobs are available in the Illinois

economy and about a half to three-quarters of a million jobs are available in the national

economy.  (*Id.*).  The VE then testified that such an individual could perform sedentary jobs

such as lampshade assembler or rotor assembler, which are part of a category of positions

for which there are about 4,000 jobs in Illinois and about 150,000 jobs nationally, or

surveillance system monitor, for which there are about 2,500 jobs in Illinois or 60,000 jobs

nationally. (R. 61-62). The VE specified that both the light and sedentary jobs would allow for an alternating sit-stand option. (R. 62).

Plaintiff's counsel also questioned the VE. First, counsel asked if the jobs the VE identified in response to the hypothetical would still be available if the individual was required to elevate her leg to waist height for twenty minutes per hour. (R. 62-63). The VE responded that it would likely eliminate those jobs, with the "possible exception" of the surveillance system monitor if the employer provided some form of accommodation. (R. 63). Plaintiff's counsel then asked about the availability of the listed jobs if the hypothetical were modified to specify that the individual was off-task one-third of the workday "due to concentration deficits as a result of pain, depression, and fatigue due to a lack of sleep." (*Id.*). The VE testified that it would eliminate the listed jobs and "would probably preclude long-term employment." (*Id.*). Finally, Plaintiff's counsel asked the VE about the availability of jobs under the ALJ's hypothetical with the additional limitation that the individual is absent one day per week from December through March "due to an increase in pain" in the winter months. (R. 64). The VE responded that such a level of absenteeism would preclude employment, as the maximum allowable absences would be a day and a half to two days per month. (*Id.*).

## DISCUSSION

### A.    Disability Standard

A claimant who can establish she is "disabled" as defined by the Social Security Act, and was insured for benefits when her disability arose, is entitled to disability insurance benefits. 42 U.S.C. §§ 423(a)(1)(A), (E); *see also Liskowitz v. Astrue*, 559

F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382a(3)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, engage in any gainful employment that exists in the national economy. *Id.* at § 423(d)(2)(A).

In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, set forth in 20 C.F.R. § 404.1520(a)(4), which requires the ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform her past relevant work; and (5) whether the claimant is able to perform other work in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520(a)(4).

## B.    ALJ's Decision

In his written decision, the ALJ in this case found that Plaintiff was not disabled prior to the date last insured ("DLI") of March 31, 2008. (R. 18). In applying the five-

step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff was not engaged in substantial gainful activity from the alleged onset date of December 7, 2002 through the DLI. (R. 20). At Step 2, he determined that Plaintiff's RSD/CRPS, degenerative disc disease, and depression constitute severe impairments. (*Id.*). At Step 3, the ALJ determined that none of these impairments met or medically equaled any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20-22). Specifically, the ALJ found that Plaintiff's disc disease did not satisfy the requirements of Listing 1.04 "as she did not have the requisite neurological deficits." (R. 20-21). The ALJ also found that Plaintiff's foot pain did not include the "anatomical deformity or the inability to use her lower extremity" required to satisfy Listing 1.02, nor did her RSD/CRPS "produce the degree of dysfunction or disability as described in Social Security Ruling 03-2p." (R. 21). Finally, the ALJ found that Plaintiff's depression did not satisfy the "paragraph B" criteria of Listing 12.04 because she had no restriction in activities of daily living, no difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, and she experienced no episodes of decompensation of extended duration. (*Id.*). Nor, in the alternative, did Plaintiff satisfy the "paragraph C" criteria since she showed no marked or extreme limitations in her ability to function, she had no episodes of decompensation, and she could function independently outside a highly structured setting. (R. 21-22).

Proceeding to Step 4, the ALJ concluded that Plaintiff retains the RFC to perform sedentary work except that she cannot climb ladders, ropes or scaffolds; can do only minimal climbing of ramps and stairs and minimal balancing, stooping, kneeling, crouching and crawling; and must avoid concentrated exposure to extreme cold,

unprotected heights, and unprotected machinery.  (R. 22).  The ALJ also specified that

the work activity "must allow for a sit/stand option every 30 minutes," and that Plaintiff

"is limited to unskilled work of 1-2 step operations due to her pain and depression."

(*Id.*).  In reaching this determination, the ALJ concluded that Plaintiff's "statements

concerning the intensity, persistence and limiting effects of these symptoms are not

credible to the extent they are inconsistent with the above residual functional capacity

assessment."  (R. 24).  Specifically, as to Plaintiff's complaints of disabling back pain,

the ALJ found that the objective medical evidence "does not demonstrate that she had

the significant limited range of motion, muscle spasms, muscle atrophy, motor

weakness, sensory loss, or reflex abnormalities associated with intense and disabling

pain" and, moreover, "she responded very well to lumbar sympathetic blocks."  (R. 25).

The ALJ also found that Plaintiff's complaints of completely disabling pain and

depression were not supported by her testimony concerning her daily activities, the

clinical findings, or the opinion evidence from the treating or consulting physicians.  (R.

25-26).  In any event, the ALJ concluded that the RFC addressed any impairments

arising out of Plaintiff's pain and depression.  (R. 25).

The ALJ then found that Plaintiff is unable to perform her past relevant work as a

bartender or abstractor because these are semi-skilled or skilled positions requiring

light or medium exertion.  (R. 26).  Relying on the VE's testimony, however, the ALJ

concluded that there are other jobs that exist in sufficient numbers in the state and

national economy that Plaintiff can perform, given her age, education, work experience,

and RFC.  (R. 26-27).  Accordingly, the ALJ found that Plaintiff was not disabled as of

the date last insured.  (R. 27).

## C.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law."  *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'"  *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).   The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations."  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "'build an accurate and logical bridge from the evidence to the conclusion.'"  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

## D.    Analysis

In her motion, Plaintiff makes three main arguments for reversal.  She challenges the RFC determination, the credibility finding, and the conclusion that she can work.  This Court discusses each in turn.

### 1.    The RFC Determination

In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform her past relevant work and/or adjust to other work, respectively, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite her limitations.   *See* 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, *2.  This requires an ALJ to consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe.  *See* SSR 96–8p, 1996 WL 374184, *5.  An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions.  *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Berger v. Astrue*, 516 F.3d at 544.

Plaintiff makes two related arguments, both contending in essence that the ALJ erred by disregarding treating physician Dr. Abusharif's purported opinion that she is unable to work.  Plaintiff first contends that the RFC is flawed because the ALJ selectively considered portions of Dr. Abusharif's opinion that do not support a finding of total disability, while ignoring portions that do support such a finding.   An ALJ may not selectively discuss only those portions of a doctor's report that support the ALJ's conclusion while ignoring those that conflict with it, however "the ALJ need not articulate his reasons for rejecting every piece of evidence."  *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000); *see also Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).  Rather, the ALJ's decision must reflect an analysis of the evidence as a whole and must provide a "logical bridge" between the evidence and the ALJ's conclusion.  *See Simila*, 573 F.3d at 516;

*Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Hurley v. Astrue*, 714 F.Supp.2d 888, 898 (N.D. Ill. 2010).

Here, Plaintiff argues that the ALJ selectively considered Dr. Abusharif's notes of June 3, 2009, which summarize his assessment of Plaintiff's progress in the work hardening program. Plaintiff provides only one example of the ALJ's purported selective review of the notes, asserting that the ALJ relied on the doctor's conclusion that Plaintiff "functions at a light physical demand and can do that quite consistently as long as there [are] some breaks in between to rest when the pain starts [to] become intense," but failed to address the doctor's statement that Plaintiff can only tolerate two hours of "any activity" before her pain becomes very significant. (Doc. 18 at 21). On their face, these statements are not inconsistent with one another and Plaintiff does not explain why she believes them to be, nor does she articulate how they demonstrate any deficiency in the RFC.

Moreover, Plaintiff mischaracterizes the statement that the ALJ allegedly disregarded. Contrary to Plaintiff's assertion that Dr. Abusharif said she can tolerate only two hours of "any activity" before the pain is too great, the doctor's notes state only that Plaintiff "is basically able [to] tolerate about two hours *of the work hardening* before the pain becomes quite significant." (R. 622) (emphasis added). As the Commissioner notes in his brief, the work hardening program consisted of strenuous physical activity, including cardiovascular training on the treadmill and stationary bicycle, as well as core and strength training exercises such as crunches, leg raises, squats, and leg presses, among others. (R. 492-502). An inability to tolerate more than two hours of strenuous work hardening exercises simply cannot be equated with an inability to tolerate more than two hours of "any activity." Yet, Plaintiff does not explain why her difficulty in completing more than two

22

hours of vigorous work hardening activity demonstrates that she cannot work at the sedentary level with a sit-stand option as set forth in the RFC. Despite Plaintiff's protestations to the contrary, the June 3rd notes contain no statement precluding her from work activity or limiting her to two to three hours of work activity per day.

Plaintiff relies on the same mischaracterization to support a similar argument later in her brief, in which she asserts that the ALJ erred in concluding that no physician found her to be disabled or unable to perform sedentary work. For her sole support, Plaintiff argues that Dr. Abusharif, in the same notes of June 3, 2009 discussed above, "determined and explained . . . that Plaintiff is incapable of performing *any* work because she cannot perform any activity for more than two to three hours at a time." (Doc. 18 at 23, citing R. 622). Plaintiff devotes much effort to arguing that this "opinion"should be afforded controlling weight because it was given by her treating physician. But as discussed previously, Dr. Abusharif's notes simply do not contain this conclusion. Nowhere in his single page of notes does Dr. Abusharif state that Plaintiff is incapable of working, let alone incapable of performing *any* work. Besides, the determination of whether a claimant is disabled or unable to work is not a medical opinion, but rather is a determination reserved for the Commissioner. 20 C.F.R. § 404.1527(e)(2). In any event, the notes merely state that Plaintiff cannot perform work hardening for more than two hours without significant pain, but otherwise affirm that Plaintiff "for the most part is able to function through her activities of daily living and has no significant problems day to day." (R. 622). Dr. Abusharif concluded that Plaintiff is "functioning at a reasonable level to perform activities of daily living if she is able to do activities in moderation of two to three hour spurts of time." (*Id.*). While Plaintiff seemingly construes this last statement to mean that Dr. Abusharif

23

found her unable to work for more than two to three hours per day, the plain language of his statements do not support such a conclusion. To the contrary, Dr. Abusharif expressly found that Plaintiff "functions at a light physical demand and can do that quite consistently as long as there are some breaks in between to rest when the pain starts [to] become intense." (*Id.*). Dr. Abusharif's statements are entirely consistent with the RFC, which restricts Plaintiff to sedentary work with a sit-stand option.

Plaintiff's next challenge to the RFC is that by failing to consider certain medical evidence, the ALJ erroneously concluded that Plaintiff's RSD/CRPS "did not produce the degree of dysfunction or disability as described in Social Security Ruling 03-2p." (Doc. 18 at 24, citing R. 21). Social Security Ruling 03-2p, which provides guidance for evaluating cases involving RSD/CRPS, specifies that the condition "constitutes a medically determinable impairment when it is documented by appropriate medical signs, symptoms, and laboratory findings," which may include "the presence of persistent complaints of pain" when accompanied by one or more clinically documented signs such as swelling and changes in skin color, texture, and temperature, among others. SSR 03-2p, 2003 WL 22399117, *4. Here, Plaintiff argues generally that the ALJ erred in disregarding medical evidence from Dr. Abusharif and other physicians that Plaintiff demonstrated such clinically documented signs of RSD/CRPS in her left foot, including "swelling, edema, discloration, hyperalgesia, hyperesthesia, allodynia, dorsiflexion, dystrophic changes, burning sensations, and a cool or warm feeling." (Doc. 18 at 21). But this misses the point. The medical evidence of Plaintiff's symptoms is relevant to the ALJ's determination at Step 2 as to whether Plaintiff's RSD/CRPS constitutes a severe impairment. (R. 20). SSR 03-2p makes this clear as the language about symptoms quoted above and upon which Plaintiff

24

relies in her brief falls under the section heading, "How is RSDS/CRPS Identified as a Medically Determinable Impairment?" 2003 WL 22399117, *4. Indeed, the language from the ALJ's decision that Plaintiff challenges does not appear in his RFC analysis at Step 4, but rather appears in his Step 3 analysis concerning whether Plaintiff's impairments, including her RSD/CRPS, met or equaled a listed impairment. (R. 21). Thus, this particular argument is not relevant to any challenge to the RFC determination at Step 4.[9]

When the ALJ goes on to consider Plaintiff's RSD/CRPS at Step 4 of his analysis, he does, indeed, identify evidence of the symptoms Plaintiff enumerates, including medical records that note "mild mottling to the skin on the left foot" and that Plaintiff complained of "disproportionate pain response to her injury" and "discomfort due to weather changes." (R. 23). SSR 03-2p provides guidance for considering a claimant's symptoms in making an RFC determination, specifying that "once the disorder has been established as a medically determinable impairment, the adjudicator must evaluate the intensity,

---

[9]     To be clear, although Plaintiff quotes language from the ALJ's Step 3 analysis, Plaintiff has not challenged the ALJ's conclusion at this step that Plaintiff's RSD/CRPS does not meet or equal a listed impairment. As SSR 03-2p notes, "Since RSDS/CRPS is not a listed impairment, an individual with RSDS/CRPS alone cannot be found to have an impairment that meets the requirements of a listed impairment." 2003 WL 22399117, *6. The alternative is for the ALJ to find "equivalence" to "any pertinent listing," including psychological manifestations under the mental disorders listings. *Id.* Plaintiff made no argument in her brief that her RSD/CRPS was equivalent to another listed impairment, whether physical or mental. Nor is an ALJ required to explain why a claimant did not functionally equal the requirements of a listing where, as here, the claimant presents no substantial evidence of it. *McGrath v. Astrue*, No. 11 C 2125, 2012 WL 1204391, *5 (N.D. Ill. Apr. 10, 2012). In any event, any error at Step 3 would have been harmless since the ALJ continued on in the sequential analysis and his finding at Steps 5 is sufficient to substantiate his determination that Plaintiff is not disabled. *See Ziegler v. Astrue*, 336 F. App'x 563, 570-71 (7th Cir. 2009) (finding harmless ALJ's factually unsupported determination at Step 4 that plaintiff could perform past work where ALJ made alternative finding at Step 5 that plaintiff could perform other jobs that exist in significant numbers); *Cadenhead v. Astrue*, No. 05 C 3929, 2010 WL 5846326, *12-13 (N.D. Ill. Mar. 5, 2010) (finding harmless any error the ALJ may have committed at Steps 1 or 2 since ALJ found at Step 4 that plaintiff could perform her past work).

persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." 2003 WL 22399117, *5-6. Like in any RFC analysis, this includes consideration of the medical signs and laboratory findings and the statements of the claimant and her treating and examining physicians. *Id.*, *6. After reviewing the medical evidence and physician opinions, as well as Plaintiff's testimony, the ALJ concluded that a restriction to unskilled work activity of one-two step operations which, among other limitations, allowed for a sit/stand option every 30 minutes was adequate. This was based on finding that: none of the doctors found Plaintiff unable to perform sedentary work; the medical records showed a positive response to treatment without significant side effects; Plaintiff is taking only Naprosyn; there is no medical evidence that she needs to elevate her foot despite her contrary testimony; and she uses compression socks but no assistive devices. (R. 25). Thus, even if Plaintiff intended to challenge the RFC finding as to her RSD/CRPS symptoms, Plaintiff has identified no medical evidence showing that her symptoms are of such intensity, persistence, or limiting effect as to call into question the RFC finding.

For the reasons set forth above, Plaintiff has failed to demonstrate that the RFC is not supported by substantial evidence.

## 2. The Credibility Finding

This Court next turns to Plaintiff's challenge to the ALJ's credibility finding. Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). Still, an ALJ must connect his

credibility determinations to the record evidence by an "'accurate and logical bridge.'"
*Castile*, 617 F.3d at 929 (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).

### a. Boilerplate Language

As an initial matter, Plaintiff argues that the credibility finding is improper because
the ALJ relies on boilerplate language indicating that he credits Plaintiff's statements
concerning the intensity, persistence, and limiting effects of her symptoms only to the
extent they are not inconsistent with the RFC. The Seventh Circuit has made clear that the
use of such boilerplate credibility language alone is insufficient where the ALJ has not also
provided some substantive analysis of the basis for the determination. *See Punzio v.
Astrue,* 630 F.3d 704, 709 (7th Cir. 2011) ("[T]o read the ALJ's boilerplate credibility
assessment is enough to know that it is inadequate and not supported by substantial
evidence."); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (finding boilerplate
language "meaningless" because it "yields no clue to what weight the trier of fact gave the
testimony"). But that is not the case here.

In this instance, the ALJ's boilerplate language was immediately followed by a
lengthy, substantive factual justification for his credibility determination. (R. 24-25).
Specifically, the ALJ acknowledged that Plaintiff is limited by her physical and mental
impairments, but concluded that the objective medical evidence supports his finding that
she is capable of unskilled, sedentary work as limited by the restrictions in the RFC finding.
(R. 25). The ALJ identified various clinical diagnostic findings and other medical evidence
that support his credibility finding, as well as noting where the absence of such evidence
contradicted or undermined Plaintiff's testimony. In addition to the medical evidence, the

ALJ relied on Plaintiff's daily activities, which he enumerated in detail, as well as her positive response to treatment, current medication, and lack of need for assistive devices. (*Id.*). He also observed that Plaintiff's testimony was not supported by any examining or reviewing doctor's opinion. (*Id.*). Furthermore, the ALJ found significant Plaintiff's contradictory statement to her own treating physician, Dr. Abusharif, only a few months prior to the hearing that she agreed with the functional capacity assessment finding her capable of light work. (*Id.*).

### b.  Debilitating Pain

Having found that the boilerplate language was accompanied by a sufficiently substantive analysis and supporting evidence, the Court now turns to Plaintiff's additional arguments challenging the credibility finding. The Court begins by addressing two arguments that Plaintiff made in the section of her brief challenging the RFC, but which the Court construes as challenges to the ALJ's credibility finding given the lack of any statement or analysis suggesting otherwise. Both arguments concern the ALJ's consideration of her testimony that her pain is debilitating.

In assessing a claimant's credibility when the allegedly disabling symptoms, such as pain, are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, 1996 WL 374186, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila*, 573 F.3d at 517 (quoting SSR 96-7p). The ALJ "should look to a number of factors to determine credibility, such as the objective medical evidence,

28

the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Simila*, 573 F.3d at 517 (quoting 20 C.F.R. § 404.1529(c)(2)-(4)).

Plaintiff first asserts that the ALJ erred by not giving greater weight to her testimony that she was in "significant pain" during the assessment and was "completely unable to function once it was completed." (Doc. 18 at 22-23). Here, there is no basis for rejecting the ALJ's well-reasoned assessment of Plaintiff's testimony concerning her pain. Plaintiff admits in her brief that in February 2009 she agreed with the functional assessment, which concluded that she could perform at the light physical demand level. Indeed, it would be difficult for her to argue otherwise, given that Dr. Abusharif's notes from a February 23, 2009 follow-up appointment state that Plaintiff "found that this was a valid representation of her functioning," leading Dr. Abusharif to recommend the work hardening program and a trial return to work. (R. 616). Nevertheless, Plaintiff asserted for the first time at the hearing before the ALJ three months later that she was in "significant pain" during the assessment and was "completely unable to function once it was completed." (Doc. 18 at 22). Plaintiff argues that this testimony is important because it bears on her ability to do sustained work activity on a regular and continuing basis. (*Id.*).

But the ALJ cited ample record support for his conclusion that the objective evidence did not support her testimony of debilitating pain. For example, he explained that "[n]o objective examining or reviewing physician has reported that the claimant is disabled or even unable to perform sedentary work," and "the medical records demonstrate that she has had a positive response to treatments without alleging or reporting significant side effects." (R. 25). The ALJ also noted that Plaintiff takes only Naprosyn for pain and that

29

contrary to her testimony that she must elevate her foot constantly throughout the day due to pain and swelling, "no evidence from treating or examining physicians establishes that [Plaintiff] has a medically required need to elevate her foot frequently during the day." (*Id.*). In addition, the ALJ concluded that Plaintiff's "wide range of daily activities" does not support her claim of debilitating pain, including her testimony that she performs daily household chores such as laundry and cooking, drives daily without difficulty, shops for groceries, and gets her children ready for school each morning. (*Id.*). The ALJ also observed that medical records show she was scheduled for jury duty "with no indication that [she] could not perform her civic duty due to her impairments." (*Id.*). Thus, in addition to relying on the lack of supporting objective medical evidence, the ALJ also relied on Plaintiff's daily activities, medication taken, and positive response to treatment received. *See Simila*, 573 F.3d at 517. The ALJ clearly gave some weight to Plaintiff's complaints of pain in determining her functional limitations, as demonstrated by the fact that the RFC restricts her to sedentary work, rather than light work as Dr. Abusharif recommended. Accordingly, substantial evidence supports the ALJ's determination to discount Plaintiff's testimony of debilitating pain and conclude that she is capable of performing sedentary work subject to the restrictions set forth in the RFC.

Next, Plaintiff makes a cursory argument that the ALJ failed to give sufficient weight to her testimony that she is unable to perform even sedentary, one-two step unskilled work because her pain prevents her from concentrating and staying on task. (Doc. 18 at 25-26). Specifically, Plaintiff argues that she repeatedly complained to her doctors and the ALJ that "she has difficulty concentrating, thinking, staying on task, finishing things she started, and

remembering things due to her pain." (*Id.* at 25). She argues that these difficulties are "further exacerbated" by her fatigue and depression. (*Id.* at 25-26). Plaintiff relies only upon her own self-serving statements, however, and cites no objective medical evidence, or indeed any evidence, that bolsters her complaints. Thus, the ALJ relied in part upon the absence of any clinical diagnostic findings to support Plaintiff's claim of total disability, including the fact that "no clinical findings support her allegation of memory loss as the MRI scan was normal." (R. 25). The ALJ also noted that Plaintiff's last mental health treatment was in December 2008, nearly six months before the hearing, and that she testified she does not take prescription medication for depression. (R. 24). Furthermore, the ALJ observed that "[d]espite alleging difficulties with memory and concentration due to disabling pain and mental problems, [Plaintiff] is able to perform a wide range of daily activities," enumerating the many activities previously cited that contradict Plaintiff's claim of total cognitive disability, including her ability to drive daily and independently, perform household chores, grocery shop, and help her children with their homework. (*Id.*). The ALJ also referenced the absence of any evidence that she sought to avoid jury service in May 2009 due to her physical or mental impairments. (*Id.*) Accordingly, the ALJ's determination to not fully credit Plaintiff's testimony of total disability in this respect was supported by substantial evidence.

### c.    Treatment History

Plaintiff next argues that the ALJ disregarded her "longitudinal treatment history and the variety of different ways she has tried to relieve her pain and other symptoms as required by SSR 96-7p." (Doc. 18 at 27). Specifically, Plaintiff asserts that her "repeated

and varied" attempts to alleviate her pain, increase her functional capacity, and return to work are evidenced by her engaging in numerous physical therapy sessions, receiving lumbar sympathetic blocks, taking prescription pain medication, and attempting a work hardening course. (*Id.* at 27-28). However, the ALJ's opinion belies Plaintiff's assertion that the ALJ failed to consider her treatment history. Indeed, the opinion contains two single-spaced pages recounting Plaintiff's medical history in great detail from the alleged date of disability in December 2002 until several months before the hearing in 2009. (R. 22-24).

The specific omissions that Plaintiff identifies in her brief are all noted in the ALJ's decision. For example, while the ALJ does not enumerate the number of physical therapy sessions Plaintiff attended, he does note that her doctor "advised [her] to continue physical therapy and activity to help maintain her RSD." (R. 23). Likewise, the ALJ explains that her "[t]reatment plan consisted of sympathetic nerve root blocks for the left lower extremity CRPS and lumbar epidural steroid injections for back pain," including citing treatment notes from January 2007 that she had an "'excellent response'" to the blocks. (*Id.*). As for prescription pain medication, the ALJ did not enumerate every one she has taken, but he stated that Plaintiff "reportedly takes the following medications: Naprosyn, Vicodin and Darvocet as needed," and he noted that "she testified she does not take prescription medication for depression" and currently takes only Naprosyn. (R. 23, 24, 25). Finally, the ALJ detailed the work hardening program Plaintiff undertook, including citing to Dr. Abusharif's notes assessing her progress in the program. (R. 24).

The fact that Plaintiff continues to experience pain and functional limitations is not, on its own, sufficient to render the ALJ's credibility finding as to her pain erroneous.

Indeed, the ALJ's decision acknowledges that she has "impairments [that] do limit her overall level of functioning," but nonetheless concluded she is not disabled for the many reasons set forth in the decision, including that neither the objective medical evidence nor the opinion evidence of the treating and consulting physicians supports a finding of total disability. (R. 25). An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions. *See Jones*, 623 F.3d at 1160; *Berger*, 516 F.3d at 544. The ALJ did that here.

Plaintiff also argues that it was error for the ALJ not to consider under SSR 96-7p her three unsuccessful attempts to return to work since her disability date. But her failed attempts to resume her prior medium exertional level job as a bartender do not demonstrate that she is unable to work at the sedentary level subject to a sit/stand option and the many other limitations set forth in the RFC finding. Thus, Plaintiff's attempts to perform her prior work, which the ALJ concluded (at Step 4) that she is incapable of doing, cannot serve as the basis for challenging the ALJ's credibility determination as to her pain.

Accordingly, it was not patently wrong for the ALJ to find Plaintiff's testimony not credible to the extent that it was unsupported by her treatment history or attempt to resume her prior work.

### d. Daily Activities

Next, Plaintiff contends that the ALJ improperly relied on her ability to perform daily activities and further erred by omitting mention of the frequency of those activities or the assistance she required to perform them. The regulations require the Commissioner to consider a claimant's daily activities as one of several factors relevant to evaluating the

intensity and persistence of a claimant's symptoms, such as pain, and the extent to which they limit the capacity for work. 20 C.F.R. § 404.1529(c)(3); *see also Simila*, 573 F.3d at 517. As Plaintiff notes, a claimant's ability to perform "fairly restricted" household activities, without further explanation by the ALJ, does not necessarily undermine or contradict a claim of disabling pain. *Zurawski*, 245 F.3d at 887. But that is not the case here. Plaintiff testified to her ability to perform a wide range of activities, both inside her home (laundry, cooking, helping her children with homework and getting them ready for school each day) and outside her home (driving daily and grocery shopping). (R. 25).

Significantly, the ALJ did not rely upon Plaintiff's daily activities to disprove her complaints of pain, but rather as one of several enumerated regulatory factors designed to assess her functional limitations. *See Dixon v. Barnhart*, No. 02 C 6410, 2004 WL 2931324, *6 (N.D. Ill. Dec. 14, 2004) (finding no error because "Plaintiff's ability to perform daily activities may not be sufficient to disprove allegations of pain but it is still relevant to the ALJ's assessment of Plaintiff's credibility and Plaintiff's ability to perform work.") (citing *Davis v. Barnhart*, 187 F.Supp.2d 1050, 1057-58 (N.D. Ill. 2002)). In fact, the ALJ's consideration of Plaintiff's testimony resulted in a *more* favorable RFC. The ALJ expressly stated that he assigned equal weight to the opinions of the state agency physicians and Plaintiff's own doctors, including Dr. Abusharif's opinion that she is capable of light work, but "with the benefit of more recent medical evidence and the claimant's testimony, finds a more restrictive residual functional capacity appropriate." (R. 26). In other words, the ALJ relied in part on Plaintiff's testimony concerning her pain as the basis for his finding that she should be limited to sedentary work with a sit/stand option, rather than light work.

Plaintiff also asserts that the ALJ erred by not identifying the frequency of each activity or those activities requiring the assistance of Plaintiff's family. While the ALJ may not have detailed those facts in his decision, again, he clearly took into account Plaintiff's testimony about her pain-related limitations by crafting an RFC finding that restricts her to sedentary work. Thus, this case is analogous to *Turner v. Astrue*, in which the Plaintiff claimed he was incapable of sedentary work despite his activities, which included cleaning his home, cooking, grocery shopping, yard work and fishing. *See Turner v. Astrue*, 390 F. App'x 581, 587 (7th Cir. 2010). There, the court found that the plaintiff failed to show the ALJ was patently wrong in concluding that plaintiff's activities, even if accompanied by pain, were inconsistent with his claim that he was physically unable to perform even sedentary work. *Id.* Similarly here, it cannot be said that the ALJ was patently wrong in considering a factor required by the regulations as but one of many factors informing his assessment of Plaintiff's credibility and functional capacity, particularly given that it resulted in a more favorable outcome for Plaintiff.

### 3. The Vocational Expert's Testimony

Finally, Plaintiff challenges on two grounds the ALJ's conclusion at Step 5 that there are a sufficient number of jobs that she can perform. First, Plaintiff contends that this finding is erroneous because the ALJ did not include in his hypothetical to the VE, or otherwise consider imposing, a restriction allowing Plaintiff to elevate her leg at waist height for twenty minutes every hour. Second, Plaintiff argues that the ALJ's hypothetical failed to consider Plaintiff's mild deficiencies in concentration, persistence, and pace.

Plaintiff's first argument is unavailing. Plaintiff's own attorney asked the VE if the jobs identified in response to the ALJ's hypothetical would still be available if the individual was required to elevate his or her leg to waist height for twenty minutes per hour. (R. 62-63). The VE responded that such a requirement would likely eliminate those jobs, with the possible exception of the surveillance system monitor if the employer provided an accommodation. (R. 63). But the ALJ was not required to accept the hypothetical restriction posed by Plaintiff's attorney, nor was the ALJ required to include such a restriction in his own hypothetical questions to the VE. An ALJ's hypothetical to a VE "must include all limitations supported by medical evidence in the record." *See Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Here, as the ALJ observed, the only indication that Plaintiff is required to elevate her leg is Plaintiff's own self-serving testimony, which is unsupported by any medical opinion or evidence. (R. 25). The ALJ also identified several other factors that weigh against the necessity of such a restriction, including Plaintiff's positive response to treatment, her daily activities, her use of compression socks but no other assistive devices, and Plaintiff's own statement to her doctor that she agreed with the assessment that she is capable of light work. (*Id.*). Accordingly, the ALJ did not err in declining to include such a restriction in the RFC or in his hypotheticals to the VE, nor did he err in concluding that Plaintiff is unable to work without such a restriction. *See Stewart*, 561 F.3d at 684; *White v. Astrue*, 820 F.Supp.2d 839, 850 (N.D. Ill. 2011) (substantial evidence supported ALJ's exclusion from RFC and hypotheticals of Plaintiff's self-reported mood swings).

Plaintiff next argues that the ALJ's hypothetical to the VE impermissibly failed to account for her deficiencies in concentration, persistence, or pace. Based on this Court's review of the facts and applicable law, this challenge to the Step 5 analysis has merit.

The Seventh Circuit has repeatedly rejected the approach of accounting for difficulties with concentration, persistence, or pace by limiting a claimant to simple, unskilled work. To the contrary, the Seventh Circuit has held that, with two narrow exceptions, the specific terminology of "concentration, persistence and pace" must be used in an ALJ's hypothetical to a VE, and merely limiting claimants to "simple, repetitive tasks" is insufficient. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619-20 (7th Cir. 2010) (collecting cases); *see also Stewart*, 561 F.3d at 684-85; *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008). The case law is consistent with the Social Security Administration's guidance, which notes that "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job." SSR 85-15, 1985 WL 56857, *6. As the guidance observes, "A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job." *Id.*

Neither of the exceptions to the general rule is implicated here. The first exception applies when the record shows that the VE "independently reviewed the medical record or heard testimony directly addressing those limitations." *O'Connor-Spinner*, 627 F.3d at 619. But, this exception does not apply where, as here, "the ALJ poses a series of increasingly restrictive hypotheticals to the VE, because in such cases [the court] infer[s] that the VE's attention is focused on the hypotheticals and not on the record." *Id.* (citing *Simila*, 573 F.3d

at 521; *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004)). The second exception applies where "it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner*, 627 F.3d at 619. However, this exception generally is limited to cases, unlike this one, where "a claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work." *See id.* (citing *Johansen v. Barnhart*, 314 F.3d 283, 285, 288-89 (7th Cir. 2002); *Arnold*, 473 F.3d at 820, 823; *Sims v. Barnhart*, 309 F.3d 424, 427, 431-32 (7th Cir. 2002)).

The case that arguably undercuts Plaintiff's position is *Simila*, because even though it did not involve stress or panic-related impairments, the court nonetheless found that omission of the terms "concentration, persistence and pace" from the hypothetical was not erroneous since the hypothetical linked the claimant's concentration difficulties with the chronic pain and somatoform disorder that caused those difficulties. *Simila*, 573 F.3d at 521-22. In discussing the *Simila* decision, the Seventh Circuit in *O'Connor-Spinner* called the omission "troubling," but concluded that the "the link between the claimant's pain and his concentration difficulties was apparent enough that incorporating those difficulties by reference to his pain was consistent with the general rule, albeit just barely so." *O'Connor-Spinner*, 627 F.3d at 619-20. The ALJ's hypothetical in this case, however, cannot survive scrutiny based on *Simila* or the Seventh Circuit's subsequent decisions. Here, the ALJ instructed the VE that "because of any mental situation, depression, and pain, and any side effects of any medicine or treatments, let's look only at unskilled work, one-two-step operations." (R. 60). Like in *Simila*, one might argue that the link between Plaintiff's pain

and depression and her difficulties with concentration, persistence, or pace should have been "apparent enough" to the VE, given that the ALJ phrased it in terms of her limiting conditions (*i.e.*, pain and depression), rather than solely in terms of the type of work she could perform (*i.e.*, simple, unskilled tasks). *See O'Connor-Spinner*, 627 F.3d at 620. But the hypothetical here was less detailed than the hypothetical in *Simila*, in which the ALJ "described all of Simila's credible impairments, physical and mental, including Simila's chronic pain and somatoform," before linking Simila's complaints of pain to the restriction to unskilled work. *Simila*, 573 F.3d at 521. Regardless, this Court is reluctant to stretch any further the latitude afforded the Commissioner in this respect, given the Seventh Circuit's subsequent conclusion in *O'Connor-Spinner* that, absent the "concentration, persistence and pace" terminology, the connection in *Simila* between the plaintiff's pain and the restriction to simple, repetitive work was "troubling" and "just barely" escaped remand. *See O'Connor-Spinner*, 627 F.3d at 619-20.

Furthermore, examining the specific facts in this case, this Court simply cannot know whether the ALJ sufficiently addressed the limitations of concentration, persistence and pace by instructing the VE to consider only simple, unskilled jobs. The purpose of including the express terminology in the hypothetical is "to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor-Spinner*, 627 F.3d at 620-21. Here, because none of the ALJ's hypotheticals referenced Plaintiff's difficulties with concentration, persistence or pace, the Court cannot be certain that the VE was sufficiently focused on identifying jobs that Plaintiff could perform despite these limitations. As SSR

85-15 makes clear, individuals respond differently to the demands of work, and "the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job" when the individual has a mental impairment. *See* SSR 85-15, 1985 WL 56857, *6. This is particularly relevant where, as here, the ALJ's questioning of the VE limits the claimant to "unskilled" work, which is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). Given the definition in the regulations, the term "unskilled" does not fully address the impact of mental limitations such as difficulties with concentration, persistence, or pace. *See Jelinek v. Astrue*, 662 F.3d 805, 813-14 (7th Cir. 2011) (finding that hypothetical limiting claimant to unskilled work did not address impact of mental limitations such as claimant's frequent difficulties with concentration, persistence or pace). Here, the VE concluded that the hypothetical individual described by the ALJ could perform the sedentary, unskilled jobs of lampshade assembler, rotor assembler, or surveillance system monitor. (R. 61-62). However, this Court cannot determine from the language of the hypothetical whether the VE identified these particular jobs merely because they are simple and unskilled, or whether he identified them because they are capable of being performed by someone, like Plaintiff, who has mild difficulties with concentration, persistence, or pace due to pain and depression.

Accordingly, the Court concludes that substantial evidence does not support the ALJ's decision to account for Plaintiff's mild difficulties with concentration, persistence, or pace by limiting her to simple, unskilled work.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 14] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion

ENTER:

Dated: July 10, 2012

_____
SHEILA FINNEGAN
United States Magistrate Judge